E-FILED

Tuesday, 22 August, 2006 04:08:09 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

| | | |
|---|---|---|
| CLARA AKINS, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | Case No. 05-2131 |
| SECURITY, sued as Jo Anne B. Barnhart, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION

In September 2001, Barbara Welsch, an administrative law judge (hereinafter "ALJ"), denied social security disability insurance benefits (hereinafter "DIB") to Plaintiff Clara M. Akins. The ALJ based her decision on findings that Plaintiff was not disabled within the meaning of the Social Security Act, and she was capable of performing a significant number of jobs in the national economy.

In June 2005, Plaintiff filed a Complaint (#1) against Defendant Jo Anne Barnhart, the Commissioner of Social Security, seeking judicial review of the final decision by the Commissioner of the Social Security Administration (hereinafter "SSA") denying DIB. In December 2005, Plaintiff filed a Motion for Summary Judgment (#10) and in March 2006, Defendant filed a Motion for an Order Which Affirms the Secretary's Decision (#14). After reviewing the administrative records and the parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment **(#10)** be **GRANTED** and Defendant's Motion for an Order Which Affirms the Secretary's Decision **(#14)** be **DENIED**.

## I. Background

Plaintiff applied for DIB based on the work record of her deceased husband, Burton M. Akins, who died fully insured on September 26, 1992. (R. 210.) Plaintiff has no past relevant work history on which to claim DIB. (R. 27.) Under SSA regulations, a widow whose spouse

died fully insured is entitled to DIB if the widow is fifty years old and has a disability, as defined under SSA regulations, which started not later than seven years after the death of the insured spouse.  20 C.F.R. § 404.335(c)(1).  Thus, Plaintiff is eligible for DIB if she is found to have a qualifying disability which began sometime between October 25, 1995, the day Plaintiff turned fifty years old, and September 30, 1999, the end of the seven-year period. (R. 27-28.)

## A.  Procedural Background

The Commissioner denied Plaintiff's original application for DIB, filed in May 1996, and a hearing was held before the ALJ in November 1997.  (R. 26.)  In a December 1997 decision, the ALJ denied Plaintiff's claim, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 150-51.)  In the wake of this ruling, Plaintiff submitted additional evidence in connection with her claim.  Based upon this new evidence, the Appeals Council determined that the matter warranted reconsideration, and the ALJ held a second hearing in November 1999.  (R. 160-62.)  In September 2001 the ALJ again denied Plaintiff's claim (R. 27), and, following a lengthy delay, the Appeals Council declined any further review, thereby finalizing the decision.  (R. 10-11.)  Following the Appeals Council's grant of an extension of time in which to file (R. 8), Plaintiff timely commenced this appeal.

## B.  Plaintiff's Medical Background
### 1.  Medical Evidence During Relevant Time Period

The medical evidence considered below covers the entire relevant time frame.  Notably, there are two separate decisions by the ALJ that are pertinent.  This discussion includes the times relevant to both decisions.  This is appropriate because the ALJ explicitly incorporated by reference her initial December 1997 decision into her second September 2001 decision.  (R. 30.)

 In August 1995, just two months before she turned fifty years old, Plaintiff visited the emergency room at the United Samaritans Medical Center with complaints of knee and thigh pain.  A physical examination noted right knee swelling and tenderness around the lumbosacral spine, and x-rays revealed a slight displacement of the patella tendon and mild degenerative changes of the spine.  (R. 298-300.)

2

In September 1995, Plaintiff saw Dr. Dennis Price.  She complained of pain radiating from her lumbar spine to her right foot.  Dr. Price, suspecting lumbar radiculitis, referred Plaintiff to Dr. Mehta, an orthopedic specialist. (R. 305.)  When Plaintiff next saw Dr. Price, she informed him that Dr. Mehta had diagnosed osteoarthritic pain and that, based on the fact that Ibuprofen had not provided pain relief, Dr. Mehta believed that fibromyalgia was causing her symptoms.  Dr. Price then advised Plaintiff to begin taking antidepressants to treat the fibromyalgia and encouraged her to undergo arthritic studies.  (R. 306.)

In November 1995, Dr. Price reported that Plaintiff complained of numerous aches and pains.  A physical exam revealed mild crepitus of Plaintiff's knees, and Dr. Price advised her again to have arthritic studies done.  Plaintiff then informed Dr. Price that she planned to see a rheumatologist, although the record does not indicate that she did so.  (R. 307.)  In February 1996, Plaintiff consulted Dr. V. E. Sekar, whose primary concern was Plaintiff's blood pressure. (R. 309.)

In July 1996, Plaintiff consulted Dr. Raja Sadiq as arranged by the Illinois Bureau of Disability Determination upon Plaintiff's application for DIB.  Plaintiff informed Dr. Sadiq that she had been diagnosed with rheumatoid arthritis, complained of pain in various joints, and reported a long history of hypertension.  (R. 322.)  Dr. Sadiq conducted a number of exams and found no sign of joint deformity, which typically attends rheumatoid arthritis.  He reported that Plaintiff's gait was normal, she had little trouble getting on and off the examining table, and tests of her range of motion and other motor functions were normal.  He further noted normal muscle strength and tone, and he found that a spinal x-ray was normal.  He observed a slight decrease in Plaintiff's range of motion in her knees, which he attributed to her obesity, and he reported that an x-ray of Plaintiff's right knee was largely normal with only a small joint effusion.  Dr. Sadiq's primary reported concern was Plaintiff's hypertension, but he noted that Plaintiff did not take any treatment due to financial concerns.  (R. 324-27.)

Plaintiff's application for DIB also resulted in a psychological evaluation, which psychologist Marilyn Kolton performed in July 1996.  Dr. Kolton's report stated that despite

3

being able to maintain her appearance and lifestyle, Plaintiff suffered from an adjustment disorder, with depressed mood and dependent personality disorder.  Notably, Dr. Kolton also opined that "further assessment of [Plaintiff's] intellectual ability may be useful" and that Plaintiff might be unlikely to find employment due to her educational level.  (R. 321.)

Plaintiff next sought medical attention in February 1997, this time presenting to Dr. Vathiar Tazudeen, a neurological specialist.  Plaintiff complained of pain all over her body and headaches, and she informed Dr. Tazudeen of her history of hypertension.  However, Plaintiff refused to submit to testing or to take medications, and Dr. Tazudeen merely instructed Plaintiff to adhere to a low-salt diet.  (R. 331.)  Plaintiff later agreed to tests with Dr. Tazudeen, and in March 1997, Plaintiff underwent electromyography and nerve conduction velocity (hereinafter "EMG/NCV") testing to assess the possibility of neuropathy in her lower extremities.  These tests showed mild nerve root irritation of Plaintiff's third and fourth lumbar vertebrae, and Dr. Tazudeen recommended a regimen of exercise to relieve Plaintiff's back and knee pain.  (R. 333-34.)

A month later, in April 1997, Plaintiff presented to the Vermilion Area Community Health Center (hereinafter "VACHC"), complaining of arthritic pain in her back and knees and constant headaches.  She also informed the examining nurse of her problem with blood pressure control.  (R. 358-59.)  Aside from Plaintiff's blood pressure, the examining personnel at VACHC found no significant abnormalities, and subsequent visits in late April and early May indicated few objectively observable concerns beyond those regarding blood pressure.  (R. 372.)

Plaintiff next sought medical attention in May 1997 at the Indiana University Medical Center (hereinafter "IUMC").  Plaintiff informed a social worker of her concerns about an abdominal lump, and also complained of severe headaches and pain in her back, legs, left heel, and ovaries.  (R. 351-52.)  Dr. Robyn Goshorn examined Plaintiff and commented that although her complaints suggested fibromyalgia, Plaintiff showed no sign of the joint inflammation typical of that condition.  Dr. Goshorn further opined that the fibromyalgia diagnosis was difficult because Plaintiff complained of pain at every point that Dr. Goshorn touched.  She

4

advised Plaintiff to increase her antihypertensive medication, to continue with the diuretic, and to begin a mild dosage of antidepressant for her musculoskeletal complaints. (R. 352-53.)

Three days later, on May 19, Plaintiff returned to Dr. Tazudeen, complaining of persistent headaches and leg and back pain. Plaintiff indicated that she did not take the anti-arthritic medication due to stomach problems. Dr. Tazudeen encouraged Plaintiff to take her antidepressants. (R. 337.)

Later that month, Plaintiff returned to VACHC, complaining of heart flutters and nocturnal leg pain. She informed the attending physician that although she was taking up to 100 Excedrin each week, she was concerned over negative information "she had read" regarding simultaneous use of antihypertensive and diuretic medications. (R. 381.) The examining physician, Dr. Kevin Kirby, opined that Plaintiff should address her problems by eliminating caffeine, remain on a low-salt diet, and discontinue pain medications. He also recommended that she continue taking her antihypertensive and diuretic medications, and additionally prescribed Corgard, a beta-blocking agent. (R. 371.)

In a June 1997 letter, Dr. Goshorn (of IUMC) advised Dr. Kirby that Plaintiff had begun a sixty-day course of Prilosec for gastrointestinal concerns, and that a recent adjustment in Plaintiff's blood pressure medication seemed to have stabilized her hypertension. She further stated that laboratory studies done at IUMC did not substantiate a diagnosis of rheumatoid arthritis, that testing for cancer had been negative, and that a computerized tomography (CT) scan of Plaintiff's abdomen was normal. (R. 380.)

In August 1997, Plaintiff returned to Dr. Tazudeen, complaining of back, neck, and head pain but expressing no new complaints. Although he noted that Plaintiff appeared mildly depressed and anxious, Dr. Tazudeen found Plaintiff's neurological exam unchanged, and advised her to continue her blood pressure medications and to return in two months. (R. 338.)

In September 1997, Plaintiff returned to VACHC, now reporting problems with her legs in addition to the headaches she had previously noted.  She also informed the examining physician that she had independently discontinued her blood pressure medications due to their high cost.  (R. 365-66.)  The examining physician instructed Plaintiff to resume these medications and referred her to Dr. Tazudeen for a repeat EMG/NCV test and a carotid artery scan.  Each of these tests were negative, and Dr. Tazudeen encouraged Plaintiff to exercise and take her blood pressure medicine.  (R. 339-40.)

While at the VACHC, Plaintiff also underwent a urinalysis.  This test showed traces of a bacterial infection, and the examining physician at VACHC prescribed a brief course of Ampicillin.  On her next visit to VACHC in October 1997, Plaintiff's primary complaint was of urinary incontinence and vaginal burning and itching, symptoms of which she had not previously complained.  Tests run at that time showed no infection, and the examining physician recommended that Plaintiff continue taking her blood pressure medication.  (R. 361-65.)

Later that month, Plaintiff made visits to both VACHC and to Dr. Tazudeen.  Her trip to the VACHC was a routine one for a blood pressure check and medicine refills, although she did complain of intermittent right ear pain and persistent headaches.  (R. 361.)  At that time Dr. Kirby found a gallbladder abnormality, and referred Plaintiff to a surgeon for consideration of gallbladder surgery.  (R. 360.)

When Plaintiff consulted Dr. Tazudeen in October 1997, her blood pressure had improved considerably and her "persistent" headaches reported to VACHC three days prior were now only "intermittent."  (R. 341.)  She did, however, complain of pain in her neck, shoulders, low back, legs, knees, and abdomen.  Despite her report of these symptoms to Dr. Tazudeen, new neurological examinations reflected no corresponding changes.  (*Id.*)

In preparation for gall bladder surgery, Plaintiff underwent pre-operative testing in early December 1997.  These tests revealed heart abnormalities, and Plaintiff rescheduled her gall bladder surgery.  In a return visit to the Vermilion County Community Clinic one week later,

6

Plaintiff complained of vomiting and she consulted Dr. James VanPopering, who remained Plaintiff's primary care physician for the rest of the relevant period.  (R. 30.)

On seeing Dr. VanPopering initially, Plaintiff reported chest pain upon exertion, a complaint not made before.  Plaintiff also reported that she did not use alcohol.  Dr. VanPopering observed an elevated blood pressure, and referred Plaintiff to Dr. Bhaskar Patel, a cardiac specialist.  (R. 441.)  Dr. Patel, who initially examined Plaintiff in January 1998, observed Plaintiff's uncontrolled blood pressure, and noted that Plaintiff had elected to stop her antihypertensive medications because she believed they did not work.  Plaintiff's refusal to follow a prescribed treatment regimen ultimately led Dr. Patel to state in June 1998 that he no longer wished to treat Plaintiff.  (R. 443-44.)  Dr. VanPopering then recommended a psychiatric referral.  (R. 444.)

In June 1998, Plaintiff returned to Dr. Tazudeen who conducted a battery of tests.  A physical exam produced essentially no abnormal findings, despite Plaintiff's continuing complaints.  An EMG/NCV test revealed moderate bilateral carpal tunnel syndrome and a whole body scan showed possible arthritic changes.  (R. 550-52.)  Dr. Tazudeen also arranged for Plaintiff to undergo an electroencephalogram (hereinafter "EEG") and magnetic resonance imaging (hereinafter "MRI").  (R. 553.)  Each was normal, although Dr. VanPopering noted that the MRI results did not allow him to rule out a disorder such as multiple sclerosis (hereinafter "MS").

Plaintiff consulted cardiologist Dr. Raymond Suchor in July 1998.  Plaintiff informed Dr. Suchor that she did not use alcohol. (R. 32.)  Initially, Dr. Suchor initiated some changes in Plaintiff's regime of medicines.  During follow-up visits later that month, Dr. Suchor reported that Plaintiff's blood pressure control was improved, but that a cardiac catheterization showed that Plaintiff's left anterior descending artery was moderately obstructed.  Recommending only medical management, Dr. Suchor reported by August 1998 that Plaintiff was doing much better.  (R. 439.)

In the fall of 1998, Plaintiff's complaints to Dr. VanPopering focused on her abdomen, and Plaintiff again began planning for gall bladder surgery, which was conducted successfully in September.  (R. 539-41.)  Plaintiff emerged reporting no more abdominal pain, but again reporting the headaches.  (R. 432.)  At this time, however, Dr. VanPopering discovered a mass in Plaintiff's left breast, and in October 1998, Plaintiff successfully underwent surgical removal of the nonmalignant mass.  (R. 562.)

Also in October 1998, Plaintiff underwent an MRI.  Although the test showed largely normal results, it did indicate some mild degenerative changes at L4-5 and L5-S1, along with a mild degree of disc space narrowing at C5-6.  (R. 519-20.)

In November 1998, Plaintiff consulted Dr. VanPopering complaining of pain in her knees, mainly the right knee, and in her back radiating down her legs.  Noting Plaintiff's memory loss, the abnormalities on the October 1998 MRI, and Plaintiff's increased use of Excedrin, Dr. VanPopering referred Plaintiff to Dr. Paul Plattner for an orthopedic evaluation.  (R. 429-30.)  In November 1998, Dr. Plattner noted that Plaintiff had suffered degenerative changes in her right knee, but he opined that Plaintiff would benefit most from weight loss and further treatment with oral analgesics and/or ibuprofen.  Dr. Plattner also gave Plaintiff an injection in the right knee for short-term pain relief.  (R. 606-07.)

In two visits to Dr. VanPopering in December 1998, Plaintiff complained of widespread pain.  In the first visit, Plaintiff complained of persisting knee pain but indicated that she had refused to return to see Dr. Plattner.  Dr. VanPopering noted an increase in Plaintiff's blood pressure, and that Plaintiff's complaints were focused on her upcoming surgery to remove an ovarian cyst.  (R. 428.)  During the second visit, on December 28, Plaintiff focused on her back pain.  (R. 426-27.)  A physical exam revealed mild arthritic deformities.  That same day, Plaintiff made similar complaints during a visit to Dr. Tazudeen.  (R. 517.)

Plaintiff underwent her gynocological surgery on December 30, 1998.  She reported to the hospital at the time that she did not consume alcohol.  (R. 563-64.)

8

Plaintiff next consulted Dr. VanPopering for a routine visit in January 1999, at which time she indicated a variety of complaints that Dr. VanPopering characterized as vague.  She complained again of knee trouble, although she still refused to see Dr. Plattner.  Dr. VanPopering recommended that she continue her previous medications and continue to see her physicians as scheduled.  (R. 424-25.)  She saw Dr. VanPopering again in February 1999, and told him at that time that her back pain no longer radiated down her right leg.  (R. 422-23.)

Meanwhile, Plaintiff continued to see Dr. Tazudeen through early 1999.  In January, her complaints focused on back pain and pain in her left leg.  (R. 516.)  In March, Dr. Tazudeen indicated his concern regarding her headaches and dizzy spells and scheduled another EEG, which produced normal results, and another MRI, which showed no significant changes.  (R. 602, 471.)  In April, Dr. Tazudeen proposed that Plaintiff's "pain all over [her] body" might be fibromyalgia and referred her to Dr. Marvin Leftick, a rheumatologist.  (R. 514.)

In April 1999, Plaintiff went to the emergency room at Provena United Samaritan's Medical Center complaining of back and right leg pain resulting from a fall.  The examining physician indicated that Plaintiff's straight-leg raising test was limited and that Plaintiff showed a mild degeneration of the lumbar spine and right hip.  Plaintiff was given Skelaxin, a muscle relaxant, and Vicodin, a narcotic analgesic.  (R. 580-81.)  The following day Plaintiff presented to Dr. VanPopering.  She now complained of "multiple joint pains" and reported that her fall the day before had occurred as a result of the pain in her right leg.  Dr. VanPopering again instructed her to continue with prescribed medications and continue seeing her doctors.  (R. 418-19.)

In April 1999, Plaintiff presented to the rheumatologist, Dr. Leftick, and complained of progressively worsening pain all over her body.  Dr. Leftick noted that Plaintiff's medical records were normal except for mild degenerative changes in the hips, spine, and knees.  (R. 478-82.)  He concluded after a physical exam that there was no "good clinical evidence" of fibromyalgia.  (R. 481.)  Dr. Leftick also recommended additional diagnostic tests for certain "bright lesions" that he noted on Plaintiff's MRI.  (R. 482.)  In recognition of this, Dr. Tazudeen arranged for a magnetic resonance angiography of the neck, which was performed in May 1999.

(R. 518.)  The test produced normal results, but Dr. Tazudeen referred Plaintiff to Dr. David Mattson of the UIMC Multiple Sclerosis Clinic for another opinion.  (R. 511.)

Dr. Mattson saw Plaintiff in August 1999, and issued a narrative summary of his conclusions in December 1999.  Essentially Dr. Mattson reported that, although it could not be ruled out based on the objective medical evidence, he thought it unlikely that MS caused Plaintiff's pain.  (R. 526.)  Additionally, he stated that Plaintiff's diagnosis may be that of a somatization disorder.  Finding no additional abnormalities, Dr. Mattson prescribed Baclofen, a muscle relaxant, and recommended that Plaintiff undergo another MRI.  (R. 522-23.)

In addition to this accounting of Plaintiff's physical ailments, the medical evidence demonstrates that she also suffered from mental ailments.  Along with Dr. Kolton's diagnosis mentioned above, Plaintiff was diagnosed with depression in August 1997 by  Dr. Tazudeen  and in October 1997 by Dr. Goshorn.  (R. 338, 345.)  Additionally, Dr. VanPopering often noted Plaintiff's trouble with memory loss.  (R. 407, 412, 418.)

## 2.  Medical Evidence Subsequent to September 1999

As noted, the relevant window of time during which Plaintiff must be found to have been disabled in order to claim DIB as a disabled widow closed in September 1999.  Thus, whether Plaintiff was or became disabled after September 1999 is irrelevant to this claim for DIB.  The only relevant evidence after that date is evidence that particularly addresses the issue of Plaintiff's medical situation within the relevant period.  Two parts of the subsequent medical history appear to fall into this category.

In July 2000, Dr. Keith Wilkey saw Plaintiff for the purpose of analyzing yet another x-ray and MRI which had recently been performed.  These tests were performed within months of the relevant period and were unaccompanied by any medical evidence of an event or occurrence in the interim which might have significantly affected that which they showed.  In reviewing these tests, Dr. Wilkey opined that "[t]here is nothing correctable in the knee short of a total knee replacement."  (R. 629.)  He went on to state that Plaintiff, due to her age and weight, was

10

presently not eligible for such a procedure; he recommended instead that Plaintiff wait and try to bring her weight down.

The other applicable evidence subsequent to the relevant period is from the examination notes of Dr. Ruth Craddock, whom Plaintiff saw beginning in May 2000.  While the majority of the evidence relevant to Dr. Craddock's evaluation of Plaintiff is inapplicable because it is outside the relevant time period, her note with regard to Plaintiff's consumption of alcohol is relevant.  She noted that Plaintiff reported that she had not had any alcohol since August 1999, but that prior to that she had been an alcoholic, particularly after her husband's death.  (R. 614.)

## C.  The ALJ's Findings and Report

In determining whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis.  20 C.F.R. § 416.920(a)-(f).  The Secretary must determine in sequence:  (1) whether the claimant is currently employed (or was during the relevant period); (2) whether she had a severe impairment; (3) whether the impairment met or equaled one listed by the Secretary; (4) whether the claimant could have performed her past work; and (5) whether the claimant was capable of performing any work in the national economy.  *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).  Once the claimant has satisfied the first two steps, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment, but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).

In this case, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the relevant time period and that Plaintiff's physical and mental problems constituted severe impairments.  Plaintiff thus satisfied steps one and two.  (R. 28-29.)  The ALJ found, however, that Plaintiff's impairments failed to rise to the level of severity of any impairment specified by the Secretary at 20 C.F.R. Part 404, Subpart P, Appendix I.  (R. 29.)  At step four, the ALJ found that Plaintiff had no relevant past work and thus the analysis moved to step five.  (R. 40.)  At step five, the Commissioner was required to show that a significant

number of jobs exist in the national economy that Plaintiff, given her physical and mental limitations, can perform.

Relevant to the step five inquiry the ALJ made the following findings:  (1) that at all times during the relevant period, Plaintiff retained the RFC to meet the physical exertional requirements of "light work"; (2) that at all times throughout the relevant period, Plaintiff was further restricted nonexertionally to jobs that require no climbing or work at unprotected heights and that allow the opportunity to alternate between sitting and standing; (3) that in consideration of her mental impairments, Plaintiff was further limited to jobs involving routine or repetitive tasks; and (4) that Plaintiff had a fourth grade "marginal" education, but was literate.  (R. 43-44.) Based on these findings, along with Plaintiff's age and work history, the ALJ concluded that the table at 20 C.F.R. Part 404, Subpart P, Rule 202.10 directed a finding of "not disabled." Accepting the testimony of a vocational expert, the ALJ determined that a significant number of jobs existed in the national economy that a person with Plaintiff's limitations could perform, and thus found Plaintiff "not disabled" within the meaning of the Social Security Act, and not entitled to DIB.  (R. 44-45.)

## II.  Standard of Review

In reviewing an ALJ's decision, this Court does not try the case de novo or replace the ALJ's finding with the Court's own assessment of the evidence.  *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).  The findings of the Commissioner of Social Security as to any fact are conclusive where that finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, the question before the Court is not whether Plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings.  *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether Plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits.  *Brooks v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996).

12

Although it is the Plaintiff who bears the burden of proving disability, the ALJ has the clear duty to develop a full and fair record, and a failure to fulfill this duty is grounds for the decision to be remanded for the gathering of additional evidence. *Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000). Furthermore, in order for this Court to find that the ALJ's ruling is supported by substantial evidence, the ALJ must "build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). This requires the ALJ to sufficiently articulate her evaluation of the evidence so that upon review this Court may assure itself that the ALJ considered all important evidence and also may properly follow the ALJ's reasoning. *Rohan v. Chater*, 88 F.3d 966, 971 (7th Cir. 1996). The ALJ is not, however, required to conduct a written evaluation of every piece of evidence. *Id.*

Finally, where the plaintiff challenges the ALJ's credibility determination, the plaintiff must show the ALJ's findings are patently wrong. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989); *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992). However, when credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determinations. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

### III.  Analysis

Plaintiff argues that the ALJ erred by (1) failing to properly assess Plaintiff's literacy, intelligence, and education; (2) failing to base her finding as to Plaintiff's credibility on substantial evidence; and (3) failing to sufficiently articulate her assessment of the evidence by disregarding the opinions of treating physicians.

### A.  The ALJ's Assessment of Plaintiff's Literacy

Plaintiff first argues that the ALJ committed reversible error by failing to properly assess and weigh the evidence regarding Plaintiff's literacy, intelligence, and education. Specifically, Plaintiff contends that (1) under the circumstances presented in Plaintiff's claim, the issue of Plaintiff's literacy was potentially outcome-determinative pursuant to Social Security Regulations; and (2) by failing to order an objective test to determine Plaintiff's literacy the ALJ

failed to fully develop the record as to this potentially-controlling question.  Plaintiff argues, therefore, that the ALJ's ruling is not supported by substantial evidence.

### 1.  The Dispositive Question of Plaintiff's Literacy

The regulations governing the Social Security Administration establish that under certain conditions the question of the claimant's literacy will be controlling as to whether the claimant is disabled.  20 C.F.R. Part 404, Subpart P, App. 2; *Glenn v. Sec'y of Health and Human Serv.*, 814 F.2d 387, 389 (7th Cir. 1987).  The Medical-Vocational Guidelines (hereinafter "Guidelines") found in the Social Security regulations provide rules, set forth in a series of three tables, which are to be used when a claimant has a severe medically determinable physical or mental impairment, is not engaging in gainful activity, and is unable to perform his or her vocationally relevant past work.  20 C.F.R. Part 404, Subpart P § 200.00(a).  The Guidelines, promulgated in 1978 for the purpose of streamlining step five of the sequential inquiry, will direct a finding of "disabled" or "not disabled" when the criteria of a rule match precisely the claimant's situation.  *Heckler v. Campbell*, 461 U.S. 458, 462 n.5 (1983).  When, as in this case, the claimant's relevant limitations are increased by findings of nonexertional limitations, the range of available jobs is further diminished, and it becomes necessary for the ALJ to particularly consider, often by receiving the testimony of a vocational expert, the impact of the additional limitations on the range of available jobs.  20 C.F.R., Part 404, Subpart P § 200.00(e)(2).

Based on the relevant findings of fact made by the ALJ, the determination as to Plaintiff's literacy was significant to the point of being outcome determinative.  The ALJ found Plaintiff to have an RFC limited to "light work," to be "closely approaching advanced age" (between the ages of 50-54 throughout the relevant period), to be literate with only a "marginal education," and to have no previous work experience.  (R. 27-28, 39.)  The ALJ further found that Plaintiff had a number of nonexertional limitations.  (R. 39.)  Based on these findings, the ALJ recognized and relied upon Rule 202.10 of the Guidelines as a framework, and solicited the testimony of a vocational expert to determine the precise range of jobs available to Plaintiff in the national economy. (R. 40-41.)

14

What the ALJ did not recognize, however, is the gravity of her finding as to Plaintiff's literacy.  In light of the other relevant findings, a determination that Plaintiff was illiterate would have implicated Rule 202.09, rather than Rule 202.10, as the proper framework for consideration of available jobs in the economy.  The distinction is critical:  Given Plaintiff's other limitations, Rule 202.09 directs a decision of "disabled," indicating that the pool of available jobs is insufficient.  Further, although the Guidelines are not mechanically applied where a claimant has nonexertional limitations in addition to exertional limitations, *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003), a claimant's nonexertional limitations only serve to bolster the conclusion that she is "disabled" when, as here, the Guidelines direct that decision based on the exertional limits alone.  *Howard v. Massanari*, 255 F.3d 577, 584 (8th Cir. 2001); *Williams v. Bowen*, 844 F.2d 748, 752 (10th Cir. 1988).  Thus, the question of Plaintiff's literacy carries controlling significance in this case.

### 2.  The Adequacy of the ALJ's Determination as to Plaintiff's Literacy

Under applicable SSA regulations, "[s]omeone [is] illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person has had little or no formal education."  20 C.F.R. § 404.1564(b)(1).  The next defined educational category, "marginal education," is defined as "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of job.  We generally consider that formal schooling at a 6th grade level or less is a marginal education."  20 C.F.R. § 404.1564(b)(2).  Although the case law applying these provisions is sparse, the Seventh Circuit has recognized that these regulatory descriptions of "illiteracy" and "marginal education" serve merely to aid in any individual determination of a claimant's literacy; they are not to be applied mechanically based on any particular factual finding.  *Glenn*, 814 F.2d at 389-90.  The critical question in determining a claimant's literacy, rather, is whether the individual can read and write well enough to hold a simple, unskilled job.  *Id.* at 391.

In determining whether an individual claimant is literate for the purpose of social security regulations, a court or administrative law judge should conduct a fact-intensive inquiry that carefully considers a wide range of applicable evidence, such as concrete examples of the

plaintiff's literacy or reasonable inferences from prior work or activities, which taken together will adequately support its conclusion.  *See Glenn*, 814 F.2d at 390-91 (holding that substantial evidence supported the ALJ's finding that claimant was literate where record contained evidence concerning claimant's sixth-grade education, types of things that he could and could not read, a live demonstration of the claimant's ability to read, and testimony regarding claimant's prior work experience relative to literacy); *Wilcutts v. Apfel,* 143 F.3d 1134, 1137-38 (8th Cir. 1998) (remanding to the Commissioner for literacy testing where the evidence supporting ALJ's determination that claimant was literate, including claimant's verbal IQ score and certain standardized test scores, was deemed insufficient in light of contravening evidence, such as testimony by claimant, claimant's doctor, and an SSA worker that claimant was illiterate); *Howard*, 255 F.3d at 584-85 (stating that ALJ failed to fully develop record as to claimant's literacy where the issue of literacy was crucial and where the record included evidence of both literacy and illiteracy).

Under this standard, the evidence upon which the ALJ relied in making her finding as to Plaintiff's literacy is clearly insufficient.  In each of the ALJ's two reports, she states and defends her determination that Plaintiff is literate only as a part of her introductory profile of Plaintiff.  Relying solely on a single, handwritten notation by a staff physician at a hospital where Plaintiff was examined in June 1997, the ALJ states in each report that "claimant completed a fourth grade education, but is literate, as reflected in a treating physician's reference to the claimant's refusal to take a prescribed medication because of information she had read concerning its potential adverse side effects."  (R. 27, 135.)  Such evidence is dubious at best in resolving the question of Plaintiff's literacy.  As such, it should have been used, if at all, only to corroborate other, more substantial proof.  Relying entirely on this questionable evidence, the ALJ's conclusory determination as to this dispositive issue was clearly insufficient.

A thorough review of the record, however, indicates that the ALJ's error was not a failure to sufficiently articulate her evaluation of the evidence as much as it was a failure to develop a full and fair record, as is required.  *Smith v. Apfel*, 231 F.3d at 437-38.  The record simply does

16

not contain enough evidence to adequately support a conclusion that Plaintiff is literate as defined under Social Security regulations.

The record contains sparse evidence tending to show that Plaintiff was literate.  Although Plaintiff completed the fourth grade, the case law is clear that education may inform, but not determine, the question of literacy.  *Glenn*, 814 F.2d at 389-90.  The Commissioner, in her brief, argues that Plaintiff's ability to live alone, hold a driver's license, and do her grocery shopping provides adequate indicia of literacy to support the ALJ's conclusion.  (Commissioner's Memorandum in Support of Motion for Summary Affirmance, #14-2, p. 10.)  Even had the ALJ relied on this indirect proof, however, it would still fall well short of the evidentiary standard established by the case law above.  Thus, the body of evidence available here is insufficient to demonstrate literacy.

The evidence supporting the conclusion that Plaintiff is illiterate, however, is similarly inconclusive.  Plaintiff's own testimony is of limited assistance.  During her initial hearing, the ALJ asked Plaintiff if she could read and write, to which she responded, "[w]ell, I can write some.  I can't most – I mean, if I write anything, I have to ask somebody how to spell a lot of the words or – and reading, I have to have somebody to do (quotation ends)." (R. 63.)  Later in the same hearing, in response to the ALJ's question as to whether she read the "newspaper, magazines, anything like that," Plaintiff responded, "I mean, maybe every once in a while, but not that often.  I don't take the paper, so (quotation ends)."  (R. 69.)  Additionally, the record shows that Plaintiff required assistance to complete any administrative form that she encountered (R. 99, 228, 230, 264), and that she struggled with even simple arithmetic. (R. 321.)

Based on this evidence, the ALJ had no way to adequately consider the question of Plaintiff's literacy.  The case law cited above establishes that the literacy inquiry is a fact-intensive one.  Here, the ALJ did not have enough facts before her to reach any conclusion that could satisfy the substantial evidence requirement.  Defendant contends that Plaintiff should have inquired more fully into the question of literacy.  However, the ALJ's duty to fully and fairly develop the record is clear, and any breach of this duty provides grounds for a reviewing

17

court to remand for further proceedings.  *Smith v. Apfel*, 231 F.3d at 437.  This obligation necessarily takes on a heightened significance when, as here, the underdeveloped issue carries controlling weight.

Therefore, because the ALJ has failed to fully and fairly develop the record as to this critical issue, this Court recommends that the matter be remanded to the ALJ for further consideration of the question of Plaintiff's literacy.  Furthermore, this Court recommends that such considerations should include, though need not necessarily be limited to, a consultative examination as to Plaintiff's ability to read and write, consistent with the provisions of 20 C.F.R. § 404.1519a(a)-(b).

### B.  The ALJ's Determination of Credibility

Plaintiff next argues that the record failed to adequately support the ALJ's findings as to Plaintiff's credibility.  Generally, this Court will not recommend overturning an ALJ's determination as to a plaintiff's credibility unless that determination is shown to be patently wrong.  *Kelley*, 890 F.2d at 965.  Where, as here, the ALJ bases her credibility finding on objective factors rather than subjective considerations, this Court has greater liberty to review the ruling.  *Herron*, 19 F.3d at 335.  On the record here, the ALJ's ruling as to Plaintiff's credibility clearly survives the heightened scrutiny of the latter standard.

In each of her decisions, the ALJ found Plaintiff's account of her symptoms to lack credibility.  At step three of the sequential analysis in her second ruling, for example, the ALJ stated that the evidence before her "sheds substantial doubt upon the reliability of the information claimant reported to her many doctors concerning her symptoms."  (R. 39.)  Her determination was supported by two primary conclusions.  First, the ALJ observed that the medical record revealed "the often-changing focus of the claimant's subjective complaints, the claimant's practice of frequently changing doctors, and her tendency to follow only those treatment recommendations of her choosing."  (R. 38.)  This, the ALJ argued, indicated that "claimant does not perceive her reported symptoms to be as chronically bothersome or functionally limiting as her testimony would suggest."  (R. 38.)  Second, the ALJ pointed to the

inconsistency of Plaintiff's reports to her treating physicians regarding her use of alcohol. (R. 38-39.)  The ALJ's thorough review of the medical record before her adequately supports each of these conclusions.

Moreover, a review of the ALJ's two decisions reveals a thorough catalog of instances supporting the conclusion that Plaintiff's testimony was less than fully credible with regard to her symptoms.  The first decision alone contains a minimum of ten separate occasions between August 1995 and October 1997 where Plaintiff reported symptoms that were significantly more severe than and often incompatible with the observations and objective testing of her examining physicians.  (R. 136-42.)  Likewise, the ALJ's second decision catalogs, as a conservative estimate, nine separate occasions when Plaintiff's statements regarding the severity of  her symptoms were either far beyond what her treating doctors reported or internally inconsistent. (R. 30-37.)  This Court thus concludes that there is on the record substantial evidence that clearly supports the ALJ's credibility determination.

Just as significant is the support provided in the second report for the ALJ's assertion that Plaintiff's shifting story with regard to her alcohol consumption undercuts her credibility.  The ALJ carefully documents a number of occasions on which Plaintiff reported to treating physicians that she did not drink alcohol, only to change her story in May 2000, when she reported that she had not consumed alcohol since August 1999 but that "previous to that, she was an alcoholic."  (R. 38-39.)

Plaintiff's arguments fail to satisfy the burden of demonstrating that the ALJ's assessment of Plaintiff's credibility is not supported by substantial evidence.  Plaintiff contends first that the ALJ has selectively constructed the record "with an eye toward denying the claim." (Plaintiff's Brief in Support of Motion For Summary Judgment, #11, p. 14).  This argument, however, demonstrates Plaintiff's own selectivity by identifying and attempting to rebut four specific instances cited in the ALJ's explanation.  In light of the evidence cited by the ALJ's decision, this effort is insufficient.

Plaintiff next contends that the instances cited by the ALJ are better viewed as consistent evidence supporting Plaintiff's claim of problems with memory and concentration.  Such an argument would have more force had Plaintiff not left unanswered the ALJ's contention regarding Plaintiff's inconsistent reports of her alcohol consumption.  In light of this significant omission, this Court is unable to conclude that Plaintiff's poor memory and general confusion somehow explain the weight of the evidence gathered by the ALJ.

Finally, Plaintiff contends that the ALJ ignored evidence with respect to Plaintiff's fibromyalgia and thereby failed to build the "accurate and logical bridge" between the evidence and the credibility decision.  (#11, p. 18, citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).  The record simply does not support any such conclusion.  The ALJ in fact specifically addresses Plaintiff's fibromyalgia claims on multiple occasions within her two reports.  (R. 35-36, 139.)  Inasmuch as the ALJ's articulation of this evidence is perfectly consistent with her credibility findings, this Court has no trouble concluding that the ALJ has accurately and logically built the bridge between the evidence and her conclusion.  As a result, this Court concludes that the ALJ's determination as to Plaintiff's credibility is supported by substantial evidence, and recommends that it be affirmed.

## C.  The ALJ's Consideration of the Medical Opinions

Finally, Plaintiff's argues that the ALJ failed to adequately consider those parts of the medical record that were contrary to her conclusions.  Applicable SSA regulations provide that an ALJ should "consider the medical opinions" in arriving at her conclusions.  20 C.F.R. § 404.1527(b).  Although the ALJ is under no obligation to articulate her reasons for rejecting every piece of evidence before her, *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995),  the ALJ cannot ignore an entire line of evidence or select and discuss only the evidence that favors her ultimate conclusion.  *Herron*, 19 F.3d at 333.

Thus, a reviewing court will remand for further consideration where the ALJ either ignores or fails to adequately consider relevant and significant evidence which supports the plaintiff's claim.  *Compare Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (vacating the

district court's decision and remanding to the ALJ where the ALJ had failed entirely to mention relevant, significant evidence, an entire report of one doctor and significant portions of another, which addressed evidentiary conflicts and tended to support the plaintiff's claim), *and Smith v. Apfel*, 231 F.3d at 438 (reversing the district court's grant of summary judgment in favor of the Commissioner and remanding where the ALJ found that plaintiff's hypertension was without "end-organ damage," but failed to discuss evidence tending to show the lesser, but still relevant dizziness cause by the hypertension), *with Jens v. Barnhart*, 347 F.3d 209, 212-13 (7th Cir. 2003) (affirming the ALJ's decision where reviewing court found that the ALJ had considered contrary evidence before denying the plaintiff's claim).

Plaintiff identifies six different examining or treating physicians whose records or reports were either ignored or selectively addressed in the ALJ's decisions:  Dr. Plattner, Dr. VanPopering, Dr. Sadiq, Dr. Kolton, Dr. Inayat Alikhan, and Dr. Wilkey.  (#11, pp. 19-21). This Court concludes that Plaintiff's arguments with regard to the first five of these instances are either improperly raised or largely without merit.  The ALJ's failure to discuss the report of Dr. Wilkey, however, is of far greater concern.

Regarding the first five doctors, Dr. Plattner is an orthopedic specialist who examined Plaintiff in November 1998 with regard to the pain in her right knee.  Plaintiff's argument that the ALJ showed "blatant disregard" in considering Dr. Plattner's report is without merit.  The ALJ cites specifically Dr. Plattner's notation that Plaintiff's knee showed "degenerative changes" (R. 33), and otherwise her consideration of any contrary evidence present in Dr. Plattner's report adequately supports and explains her conclusions.

Dr. VanPopering was Plaintiff's primary care physician starting in 1997.  Plaintiff contends that the ALJ improperly failed to discuss a note written by Dr. VanPopering in November 2000 in which he states that Plaintiff's medical problems are "affecting her with increasing severity," and that she has "come to the point of being disabled" (R. 658.)  For two reasons the ALJ rightly disregarded this letter.  First, it pertains to Plaintiff's condition outside the applicable window of time and is thus irrelevant.  Plaintiff's argument that the letter relates

21

to the time period at issue fails to recognize that Dr. VanPopering's assessment is explicitly stated in cumulative terms.  It must be read as contemplating the entire period of time leading up to November 2000, including some fourteen months not relevant to Plaintiff's claim.  Furthermore, Dr. VanPopering's conclusion that Plaintiff is "disabled" is of no significance under SSA regulations: The determination of "disability" is one solely for the SSA or designated State agency, and is not one that another other agency or individual can make.  20 C.F.R. §§ 404.1503(a)-(b), 404.1504.  These factors, along with the ALJ's thorough treatment of Dr. VanPopering's records generally, support the conclusion that the ALJ adequately considered Dr. VanPopering's reports.

With regard to Dr. Sadiq and Dr. Kolton, Plaintiff argues that the ALJ ignored the evidence pertinent to these examining physicians altogether.  It will suffice to point out that ALJ Welsch discussed evidence with respect to each of these doctors in her December 1997 report (R. 137-38, 143), which she explicitly incorporated by reference into her September 2001 report. (R. 30.)  The ALJ's discussion of each, moreover, was clearly sufficient.

Plaintiff's argument that the ALJ failed to discuss the evidence with regard to treating psychiatrist Dr. Alikhan, though accurate and thus of more concern, is also misplaced.  As far as the record shows, Dr. Alikhan began treating Plaintiff sometime in 2000, and wrote a letter dated November 15, 2000, noting that he was treating Plaintiff for depression, anxiety, and nervousness, and opining that Plaintiff "can not [sic] return to work for next 12 month [sic]." (R. 657.)  Plaintiff further notes that at the November 2000 hearing the ALJ refused to give any weight to Dr. Alikhan's note.  Although case law establishes the significant concerns raised by the omission of relevant contrary evidence, Dr. Alikhan's note was written well after the relevant period, and nothing in the record indicates that his analysis is in any way pertinent to the operative window of time.  Therefore, the ALJ was correctly omitted Dr. Alikhan's note from her report.

The ALJ's omission of the medical conclusions of Dr. Wilkey, however, is of greater concern.  In contrast to the opinion of Dr. Alikhan, this Court considers the report of Dr. Wilkey

relevant notwithstanding the fact that it was made after the applicable time window closed on September 30, 1999.  Both the substance of the report and the actions of the ALJ in response to it warrant such a conclusion.

After examining Plaintiff and reviewing the MRI of Plaintiff's knee taken in June 2000, Dr. Wilkey reported that "[t]here is nothing that is correctable in this knee short of a total knee replacement," adding that Plaintiff's age and weight presently made that procedure impossible. (R. 629.)  Although medical evaluations of Plaintiff's knee impairment had varied throughout the relevant period, the ALJ mentions concerns of both Plaintiff and her array of physicians regarding Plaintiff's right knee throughout her decision.  In fact, the ALJ notes a positive x-ray of Plaintiff's right knee when discussing Plaintiff's first medical consultation during the relevant period, in August 1995.  (R. 136.)  Further, the ALJ found arthritis of the knees to be one of the impairments established by the medical evidence.  (R. 43.)  In light of this finding, and without any evidence that some drastic degeneration occurred between the end of Plaintiff's window of relevant time in September 1999 and the MRI in June 2000, this Court finds it perfectly reasonable to conclude that Dr. Wilkey's opinion was relevant.

Furthermore, the actions of the ALJ indicate that she had reached the same conclusion. In March 2001, the ALJ wrote Dr. Wilkey a letter requesting clarification regarding his report. Presumably unsatisfied by Dr. Wilkey's conclusions, the letter opines that "the MRI and X-rays do not appear to establish such a severe condition," and asks Dr. Wilkey to "explain how [he] arrived at [his] conclusions regarding the severity of the claimant's knee condition."  (R. 675.) The ALJ concluded by asking whether Plaintiff's knee condition has worsened recently.  *Id.*  In response, Dr. Wilkey understandably expressed his confusion at the ALJ's letter, and politely referred her to his initial evaluation, which he deemed fully explanatory of the matter.  (R. 676.) He concluded by stating that he had no grounds for believing that the condition had worsened.

This letter is cause for significant concern.  This Court initially notes the well-established principle that an ALJ is not authorized to substitute her own judgment for that of the medical witnesses.  *Rohan*, 98 F.3d at 971.  The substance of the ALJ's letter indicates that she

23

had done precisely that.  Inasmuch as the ALJ's decision ignored Dr. Wilkey's opinion altogether, however, the problem indicated by this curious correspondence is not the ALJ's improper substitution of her opinion for that of a medical witness, but the ALJ's failure to consider clearly significant contrary medical evidence.

The ALJ's decision should have discussed Dr. Wilkey's relevant and significant medical evidence.  The ALJ rightly identified Plaintiff's arthritis in her right knee as one of her impairments.  Dr. Wilkey's conclusion that only a knee replacement would resolve Plaintiff's knee problem was clearly significant to Plaintiff's claim.  The letter to Dr. Wilkey establishes that the ALJ recognized this fact.  This Court concludes that by failing to discuss Dr. Wilkey's medical opinion the ALJ violated her duty to sufficiently articulate the reasoning supporting her findings.  Therefore, this Court recommends that on remand the ALJ should either discuss Dr. Wilkey's report or explain her reasons for not doing so.

## IV.  Summary

For the reasons set forth above, this Court recommends that the Plaintiff's Motion for Summary Judgment **(#10)** be **GRANTED** and the Defendant's Motion for an Order which Affirms the Secretary's Decision **(#14)** be **DENIED**.  The decision of the ALJ should be reversed and the case remanded pursuant to sentence 4 of 42 U.S.C. § 405(g)[1] for further consideration consistent with this recommendation.  Remand pursuant to 42 U.S.C. § 405(g), sentence 4 will terminate the case.  *Shalala v. Schaefer*, 509 U.S. 292, 299 (1993) (a sentence 4 remand order terminates the case).

The parties are advised that any objection to this recommendation must be filed in writing with the Clerk within ten (10) working days after being served with a copy of this Report

---

[1]Under 42 U.S.C. § 405(g), Sentence 4, "[t]he court shall have power to enter, upon pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538 (7th Cir. 1986).

ENTER this 22nd day of August, 2006.

_____
s/ DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE
